The Chief Justice, after stating the counts in the indictment, and the evidence, delivered a charge to the Jury, in the following manner.
 

 M'Kean,
 
 Chief
 
 Justice.
 

 The severity of the punishment to be insisted in case of a conviction (a punishment the same, in its nature, as is inflicted for the most infamous crimes) ought certainly to induce the Jury to deliberate well, before they determine, that the act committed by the defendant, constitutes the offence, which is the object of the law. The extravagant operation and extent of the doctrine, on which the prosecution is maintained, ought also to awaken the most serious attention: For, it has been contended, in effect, that should a traveller bring into this state a negro or mulatto slave; nay should a tradesman of
 
 Pennsylvania
 
 have a negro or mulatto-indented servant, who, being sent on an errand, loiters away his time in tippling and debauchery, the master cannot forcibly seize and carry the delinquent to another' place, either beyond, or within the jurisdiction of Pennsylvania, without incurring the penalties of the act of Assembly; if it is intended afterwards to keep and detain the negro or mulatto as a slave or servant. Is it rational to conceive, that' any legislative body would have destined for such an act, so grievous a punishment! Again: It has been alledged, that the law has made no difference, and, therefore, that the Court can make none, between a freeman and a slave, provided the injured party is a negro, or mulatto. But is it possible, that any individual of common sense, that any assemblage of enlightened men, should so confound the nature of things, should so pervert the principles of justice, as to suppose, that it is as criminal for a maker to carry off his own slave with the intent to retain him in slavery, as for a stranger to carry off a freeman, with the intent to fell him into bondage! Can these actions merit the same degree of punishment!
 

 It is evident, however, that such enormities are not imputable to the Legislature of
 
 Pennsylvania. By the 10th section of the
 
 act for the gradual abolition of slavery (1
 
 vol. Dall. Edit. p.
 
 841)
 
 p
 
 ersons merely sojourning in this State have a right to retain their slaves for a term of six months; and the delegates in Congress from other States, Foreign Ministers, and Consuls enjoy that right, as long as they continue in their public characters.
 
 *227
 
 The succeeding section, likewise, expressly provides, that absconding slaves shall derive no benefit from the law; but that their mailers shall have the same right and aid to demand, claim, and take them away, that they had before. This act of Assembly, and particularly these provisions, are not repealed by the supplemental act, on which the prosecution is founded. Then, we find, that any traveller, who comes into Pennsylvania, upon a temporary excursion for business, or amusement, may detain his slave for six months; and the previous law (recognized by the act of Assembly, during that term) authorizes the master to apprehend the slave, and entitles him to the aid of the civil police to secure and carry him away. By a regulation of this kind, the policy of our own system is reconciled with a due respect to the systems of other States and countries; while an opposite construction would render it impossible for any American, or Foreigner, to pass with a slave through the territory of
 
 Pennsylvani
 
 a.
 

 It has been said, that the words
 
 "
 
 slaves or servants,” which are used in the other provisions of the supplemental act, being omitted in this section, it must be inferred, that the Legislature intended to protect the slave or servant, as well as the freeman, from the outrage contemplated: but, in our opinion, that very omission shews the fallacy of such a construction; for, if the Legislature designed to protect freemen, and not slaves, they could not, in any other way, more effectually manifest their meaning. In short, the evil apprehended was that of forcing a free negro, or mulatto, into another country, and there, taking advantage of his color, to sell him as a slave; and for such an offence the punishment denounced by the law would be justly inflicted.
 

 Upon a review of the facts, likewise, we find occasion to regret, that the prosecution should have been conducted with a zeal, which rarely appears in the prosecution of the highest criminal, on the strongest proof. There is not, however, a tittle of evidence to establish the charge, that the defendant seduced the negro, or that he even spoke to him in
 
 Pennsylvania,
 
 where the act of seduction must by committed, to vest the jurisdiction in the Court. Nor can it be fairly said; that he caused the negro to be seduced; for, the advice given to General
 
 Sevier
 
 was merely the advice of a friend; which could not surely merit the ignominious punishment of the law; and which was not, in fact, adopted, as the negro was forcibly, and not by seduction, sent out of the State.
 

 But, upon the whole, we were unanimously of opinion, as soon as it was proved the negro was a slave, that not only his master had a right to seize, and carry him away; but that, in case he absconded or resisted, it was the duty of every magistr
 
 *228
 
 ate employ all the legitimate means of coercion in his power, for and restoring the negro to the service of his owner, whithersoever he might be afterwards carried.
 

 Verdict, NOT GUILTY.